IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:14MJ271(WIG) |
| | : | |
| v. | : | |
| | : | |
| | : | |
| YU LONG | : | March 5, 2015 |

**GOVERNMENT'S MEMORANDUM IN OPPOSITION TO PRETRIAL RELEASE**

The Government submits this memorandum in response to defendant Yu Long's ("Long" or "defendant") motion for pre-trial release. For the reasons set forth below, the Court should deny the motion and order that Long be detained pending the outcome of this criminal proceeding.

Long, a native and citizen of China, was arrested on November 7, 2014 after he was identified at Newark International Airport with highly sensitive documents pertaining to U.S. military jets. Long seeks pre-trial release claiming that he presents neither a flight risk nor a danger to the community. Long proposes that he will reside in a house here in Connecticut that is owned by his girlfriend, that he will provide the Court with his passport, that the properties could be posted as bond[1], and that he is willing to agree to electronic monitoring. Alternatively, Long requests that he be permitted to stay with his girlfriend who resides in Ithaca, New York. Long claims that his immediate family all reside in the U.S. and that prior to his federal arrest he was caring for his baby daughter and therefore he has no incentive to leave the United States. Long fails to inform the Court, however, that since May/June 2014 he has been employed in China where he has not only transported his knowledge and experience but also exported highly sensitive

---

[1] It appears that one of the properties has no equity. Both residences appear to be owned by a corporate entity belonging to Long's girlfriend who has no permanent status in the United States and based on information to date appears to have significant financial resources.

military technology to China in violation of U.S. law. In short, Long presents a serious danger to the community and is an obvious flight risk given his ties to China and the certainty of his conviction of serious criminal charges.

As set forth in detail below, the evidence uncovered to date establishes that while Long was working with a United States military defense contractor which will be referred to as Company A, Long was recruited as part of a "talent" program run by the Chinese government and that Long has been willing to transport highly sensitive military documents to China that he accessed and improperly retained during the time he worked at Company A. Long is a clear danger to the United States because he surreptitiously stole and attempted to transport and transported to China hundreds of pages of extremely sensitive military technology in violation of United States law. Moreover, a review of Long's digital evidence to date includes correspondence with individuals in China associated with a government run program which describes work on the engines for the F-22 Raptor and F-35 Joint Strike Fighter program. The F-22 Raptor fighter jet has been developed exclusively for the U.S. Air Force. Export sales of the F-22 Raptor are banned by U.S. federal law. The F-22 is known to be the most advanced fighter jet.

Moreover, it is noteworthy that the defendant was en route to China when he was placed in secondary inspection at Newark International Airport. An examination of his luggage included three documents from a different out-of-state defense contractor (hereinafter "Company B") demonstrating that Long was collecting information relating to a highly sensitive program run by the United States Air Force. More importantly, Long's communications to individuals in China make clear that he had no interest in remaining in the United States and therefore presents an extraordinary flight risk.

In light of Long's willingness to surreptitiously steal and transport highly sensitive advanced military technology to a foreign country with whom the United States does not have an extradition treaty, in light of his desire to leave the United States, and in light of the fact that he was arrested at Newark International Airport attempting to board a flight with a final destination of China, there are simply no conditions of release that can assure his appearance in Court and the safety of the community.

## I. BACKGROUND

### 1. Long's Employment and Family Ties in the United States

Long is a native and citizen of China who entered the United States in 2004 to pursue a Ph.D. in Mechanical Engineering from Clemson University, which he received in 2008. In May 2008, Long accepted a position with a research center for Company A as a Senior Engineer/Scientist in the Material Science Group, a position he held until he resigned in May 2014. Long received his lawful permanent resident status in 2010. Long and his girlfriend have two children. In or about July 2014, Long traveled with his eldest daughter to China and left her with family in China. The second daughter was born on or about September 11, 2014 and resides with Long's girlfriend in Ithaca. Long also has a child from a previous marriage who resides with his ex-wife in Massachusetts. In December 2014, an FBI agent in Boston interviewed Long's ex-wife. At the time of the interview, according to the ex-wife, Long stopped making child support payments in or about May 2014 when Long left his job at Company A. Long's ex-wife stated that they were scheduled to go back to court to address his lack of payment, but that did not materialize due to the fact that he was arrested on November 7, 2014. Accordingly, at the time of the interview in December 2014, according to Long's ex-wife, she had not received child support payments for more than half a year, since in or about

May 2014. This disturbing disregard for a court ordered child support requirement certainly suggests, at best, that Long has an inability to follow court orders and at worst, has no respect for the rule of law.

When Long began his employment with Company A in 2008, and again at or around the time that his employment terminated with Company A in 2014, Long signed documents with Company A regarding intellectual property and proprietary information acquired during the course of his employment. In addition, in a Company A "Exit Process Checklist" executed by Long on May 30, 2014, he signed and acknowledged, in pertinent part that: "[a]ll company property has been returned to the appropriate individual(s). I acknowledge that I am not retaining or taking away with me any material of a Controlled or Proprietary nature . . . ." Documentation received from Company A also establishes that Long received extensive training on the handling of export controlled material.

**2. CAS and SIA**

The Chinese Academy of Science ("CAS") is a ministry under the State Council of the People's Republic of China ("China" or "PLC"). "The State Council of the PLC, namely the Central People's Government, is the highest executive organ of State Power, as well as the highest organ of State administration." The CAS has various regional branches including in Shenyang and Guangzhou. *See* http://english.gov.cn/state_council/2014/09/03/content. CAS offers a variety of highly competitive talent programs and fellowships that individuals can apply for. Based on the 2013 Annual Report of the CAS, CAS focuses on, among other things, "recruiting high-level personnel." The report goes on to state, "[t]he academy recruited 48 high-level experts

from overseas through long and short-term projects under the Thousand Talents Program[2], as well as 111 excellent young scientists from overseas through the Thousand Young Talents Program, and 12 foreign scientists through the Thousand Foreign Experts Program. CAS provided support for top experts and innovation teams affiliated with the Thousand Talents Program and established corresponding research units for them." *See* Report at 73.[3]

The Shenyang Institute of Automation ("SIA") was founded in November 1958. Based on publically available literature,

> for more than 50 years, SIA has advanced automation science and engineering making significant contributions to society, the economy and national security."

---

[2] 1, The basic requirements:

"Thousand Talents Program" invites talents who obtain doctor's degree from overseas, and in principle shouldn't be more than 55 years old. After the introduction they should work generally no less than 6 months in China each year, and meet one of the following requirements: Experts that are equivalent to professors in the famous foreign universities or research institutes; Talents who are accomplished in technology and management and hold senior titles in well-known international companies or financial institutions; Talents that own independent intellectual property rights, master the core technology, possess experience in managing their own businesses overseas, be proficient in relevant industries and international rules, or high-level talents that are urgently needed in other categories.

According to different features of the creative talents and incubative talents and the specific needs of different career platforms, the proposed introduced talents should also meet other corresponding requirements. For example, first, the talents should have independent intellectual property rights and patents, and their technology is internationally advanced, able to fill the blank, has market potential and can be produced industrially; second, the talents should have overseas incubation experience, or rank middle or senior management positions in internationally well-known enterprises for more than 3 years, be familiar with relevant fields and international rules, and own management ability; third, talents' own funds(including technology shares) or overseas risk investment should accounted for more than 50% of the incubative capital.

The each recruited expert will get 3 million RMB (about 472, 200 USD) for starting funds and 1 million RMB (about 157,400 USD) for settling-in allowance by CAS, and another supporting funds by SIA".

*See* http://english.sia.cas.cn/ju/Academic/201204/t20120417_83966.html

[3] Documents referred to in this memorandum can be made available to the court in camera. The FBI and defense counsel are currently discussing how to provide copies of all of the digital media to defense counsel.

> http://english.sia.cas.cn/au/bi/201312/t20131230_115083.html. Since 1985, SIA has established exchange and collaboration programs with universities, research institutes and high-tech companies in the United States, Russia, Japan and various European countries. Nearly 100 SIA researches travel abroad annually to participate in various exchange activities. *The institute also actively recruits overseas talent to conduct research at SIA under the CAS Thousand Talents Program*, the CAS Hundred Talents Program, and the CAS Visiting Professorship for Senior International Scientists Program, among others.
>
> *Id*. (emphasis added).

**3. Long's Search for Employment with CAS/SIA**

Based on digital media and other evidence obtained after Long's November 7, 2014 arrest, since 2013 Long expressed his intent to return to China to work on research projects in China using the knowledge and the export controlled material that he unlawfully possessed. Based on e-mails dated November 2013, Long spoke with individuals in China associated with SIA and had scheduled an interview for the "hundred talent plan A" in Shenyang, China in late November 2013. In an e-mail dated November 20, 2013, Long writes to an individual at SIA:

> I will arrive at Shengyang Sunday night, believe Tianxiang will schedule the interview on Monday afternoon Nov. 25. So, Monday morning may be a good time to have discussion with your group. Since lots of works are export controlled, I will not bring details of these work to China. My verbal presentation will be very high level summary, and I will be happy to orally answer any questions from your group.

In a December 24, 2013 e-mail, Long writes:

> I have made my mind to return to China, so have prepared a research plan based on my industry experience and current projects. Would you please forward it to Zhe Jiiang University, SJTU Michigan Institute, and other places where you think feasible. . . I am not sure if any of these is interested in me, but like to know the answer before signing with SIA.

A copy of the research plan was also found on Long's digital media. In the research plan makes clear that Long intends his work to benefit his native China. Long writes:

> China has gained valuable experience in aircraft design around the 1980s

> via the collaboration with US at Chengdu. The reverse engineering on Russia's aircraft at Shenyang also achieves certain success. However, design and manufacturing of the core component of an aircraft, the engine, is still dragging China's aerospace industry, because there lack direct inputs and experiences from U.S. or Russia.
>
> Currently, the engine business outside Russia is occupied by only three companies: [names the companies, including Company A]. [Company A] has dominated US military engine market right now with their F110, F117, F119, and F135 engines, and provided almost 50 percent new commercial engines because of its game changing geared turbine fan (GTF) next generation engine, as well as its strategic partnership with [other Companies] certain type of aircrafts.
>
> In the past five years, I have been working with [Company A], also other [Company A and Company B] business units. . . These unique working experiences have provided me a great starting point to perform R&D and further spin off businesses in China. I believe my efforts will help China to mature its own aircraft engines.
>
> *Lots of information are sensitive and under export control. I will obey carefully the related law and regulations in both US and China.*

(emphasis added).

The research plan continues to discuss a three to five year research and development plan and also includes a paragraph about China's lack of performance in using certain machines – information that Long attributes to Company A's "strategic sourcing department."

In a follow up e-mail, a Professor forwards Long's resume to others in China and indicates that Long works for Company A, a known defense contractor. By late December 2013 and early January 2014, Long communicates with individuals in China about applying for the Thousand Talents Plan In an e-mail dated February 2, 2014, the subject matter heading states: "have to leave [Company A] soon." In that e-mail, Long acknowledges that he will likely be terminated from Company A and that he will likely no longer be working for Company A by May or June 2014. Accordingly, Long indicates that he does not have time to wait for the Thousand Talent

plan application process and if he is not employed by May/June, "[he] will join SIA". On April 20, 2014, Long writes an e-mail stating, "I plan to join Chinese Academy of Sciences as a visiting full researcher around the end of May."[4]

In an e-mail dated May 16, 2014, Long communicates with an SIA employee that he plans to join SIA by the end of May stating, "I will come to SIA around the end of this month. Could you advise me what documentation and paperwork I should prepare/bring for me to start the job at SIA."[5] A resume was located on Long's digital media that states that from June 2014 until the present, Long was employed as a Professor at the Chinese Academy of Science.

Moreover, other e-mails indicate that on July 23, 2014 and July 24, 2014, Long was interviewing with a university in China in connection with one of the talent plans. In emails beginning on or about August 1 until August 11, 2014, Long confirms his interest in applying for the thousand talent plan. In e-mails between Long and individuals at CAS, there is a discussion about details such as the amount of research funds that Long will receive for his project as well as Long's salary. In subsequent e-mails, Long was provided with the application for the Thousand Talents Program and individuals in China requested that he provide, among other things, "the documents [he] wrote, a copy of his educational degrees, a letter of employment setting forth his experience since 2008 and a list of his publications/patents and projects that he is leading. In December 2013, it appears that in response to individuals in China inquiring about his qualifications for the application, Long responds with a cover sheet of a Company A export controlled document. There are other e-mails that indicate that individuals in China connected

[4] Other e-mail dated April 2014 between Long and individuals in China indicate that the Thousand Talent Plan application was not yet available but that Long was continuing to work on a draft application.

[5] There are e-mails between Long and Purdue University. More specifically, on June 10, 2014, Long writes to Purdue, "I accept the offer and am excited to join Purdue." In response, a member of Purdue's responds, "[y]our acceptance note has come well after our deadline, and the offer is no longer available."

with CAS were assisting Long with his application and providing comments to his draft application.

**4. Long's August 19, 2014 entry into the United States**

On or about August 19, 2014, Long returned to the United States from China through John F. Kennedy International Airport in New York. Upon his return, and during a secondary inspection screening by United States Customs and Border Protection, Long was found in the possession of $10,000.00 in undeclared U.S. cash. On his CBP landing card, Long had declared only $100.00 worth of merchandise to include "decorations" such as a "wall clock." Long was required to fill out a United States Department of Treasury "Report of International Transportation of Currency or Monetary Instruments" Form, declaring that he had imported from China into the United States $10,000 in United States cash. At the top of the form, in all capital letters, there was a notation indicating that Long claimed to have been "FORCED" to complete the form.

Included within the documents obtained by CBP pursuant to the August 19, 2014 secondary inspection was a document describing a proposal to recruit a particular individual as a visiting professor at Tsinghua University, Beijing, China. The individual is the Chief Engineer at China Aerospace Science and Technology Corporation. The proposal also outlined a plan to establish an aviation and aerospace manufacturing technology research center, and mentioned that three members of the "One Thousand Talent Plan" program would be available to assist with the research center. Based on information available, China Aerospace Science and Technology Corporation ("CASC") is one of the most important organizations in the Chinese space program, and is subordinate to the Chinese People's Liberation Army General Armaments Department. Also found among the documents obtained by CBP pursuant to the August 19, 2014 secondary inspection was what appeared to be a partially completed application for the "One Thousand

Talent Plan for Young Scholars."

The "Thousand Talents Program for Distinguished Young Scholars" is a program which invites overseas Chinese applicants under 40 who have received their doctorates from an international university, have three years of international teaching or research experience, and are qualified scientists or engineers with leadership potential to work full-time in the PRC. The document was a multiple-page document in Chinese, with information about Long, set forth in English. The document set forth some of Long's work history and experiences he obtained while employed at Company A. Among other things, the document stated that Long had worked at Company A facilities and had "led [Company A] sponsored projects." Among other things, the document stated that Long had experience in "Digital manufacturing" and "Physics based Multi-axis machining" involving "superalloy complex geometry part high efficient and high quality machining." The document also set forth Long's participation in training programs, presentations and research papers that he was involved with. The document also highlighted Long's apparent work on such things as "new material development such as high temperature AI," "surface integrity protection," "multiphase superalloy machining" "composite modeling and simulation" and "micromechanics based progressive damage model[s]." The document also stated (and appears to claim that Long had): "[o]ptimize[d] the manufacturing of the FI19 and F135 air flow path in LPC and HPC, reduc[ing] machining mark and surface roughness . . . ."; and "[f]irst propose[ed] and implement[ed] High Pressure Die Casting for Nickel Superalloy, which significantly reduce[d] the manufacturing cost and time for superalloy." In adjoining columns, and apparently associated with the preceding information and with each other, appeared references to Company A subsidiaries, monetary amounts, and years.

The FI19-PW-I00 turbofan engine is an engine manufactured by a Company A subsidiary

and is employed by the United States Air Force F-22 Raptor fighter aircraft. The F135 is an engine manufactured by a Company A subsidiary derived from the FII0-PW-I00 and employed by the United States Air Force F-35 Lightning II fighter aircraft.

The previously mentioned reference appearing to claim that Long had "[o]ptimize[d] the manufacturing of the FI19 and F135 air flow path in LPC and HPC ... " occurred within a section of this application requesting the applicant's major achievements and/or leadership in any major research projects. The previously mentioned reference appearing to claim that Long had "[o]ptimize[d] the manufacturing of the FI19 and F135 air flow path in LPC and HPC ... " occurred within a section of this application requesting the applicant's major achievements and/or leadership in any major research projects.

The packet of documents copied by CBP during the August 2014 secondary inspection also included an "Application for Entry for Investment (to establish / join in business)" in China. This application, dated July 20, 2014, was completed in the name of Long's girlfriend, to set up a limited liability company in her name in China. After entering the United States in August 2014, Long temporarily resided with his girlfriend in Ithaca, NY. In an e-mail dated October 22, 2014, Long writes an email with the subject line heading, "Application form of Youth 1000 plan," stating, "I am still at Cornell University. While taking care of my new born baby girl, I am finding some interesting 3d printing research topics here, like to dig them out more. I plan to fly back to China in Dec with my wife and babies together."

**5. Long's November 5, 2014 attempted flight to China**

On November 5, 2014, Long boarded a flight from Ithaca, New York to Newark Liberty International Airport, with a final destination of China. During Long's layover in Newark, CBP officers inspected Long's checked baggage – which had traveled from Ithaca, New York to

Newark, New Jersey – and discovered that it contained, among other things, documents from a second major defense contractor [Company B]. As a result of this development and subsequent interaction with law enforcement authorities, Long did not take his intended flight on to China, and subsequently returned to Ithaca, New York to reside with his girlfriend. The documents, bearing dates from March 2010 through October 2011, each contained warnings indicating that they were export-controlled, proprietary and/or subject to "consortium restrictions."

Upon further questioning, Long stated that he had also been in contact with Tsinghua University in China for possible employment associated with the "Thousand Talent Plan." Long explained that the "Thousand Talent Plan," is a program through which China attempts to hire individuals from abroad where individuals in China do not possess the same sought-after education and skills. Long claimed that he had not yet been interviewed for the Thousand Talent Plan, but hoped to read up on new information, such as the documents in his possession at the airport, prior to seeking a telephone interview, in the hopes that it would help him acquire the job. When asked further about his contact with Tsinghua University, Long stated that they had approached him and asked him to apply.

Long denied ever having worked on the FI19 or F135 engine while at Company A. When asked why the Thousand Talent Plan application found in his possession during the August 2014 CBP secondary inspection at JFK Airport referenced what appeared to be his work on the FI19 and F135 engines, Long claimed that the application was pre-populated by Tsinghua University with what they believed was his work history, and Long was supposed to correct the application to accurately reflect his actual experience.

Further investigation determined that during all times relevant to the criminal complaint filed in this case, the United States Air Force had convened a consortium of major defense

contractors to work together to see whether they could collectively lower the costs of certain metals used. The project was known as the "U.S. Air Force Metals Affordability Initiative (MAI)." Company A and Company B, among others, were part of that MAI consortium. As part of those efforts, members of the MAI consortium shared technical data to promote full and open dialogue during the project. The sharing of information, data and material was subject to stringent restrictions set forth in a MAI Collaboration Agreement that among other things, prohibited the duplication, use or disclosure in whole or in part of any information, data or material learned or acquired as part of the consortium for any purpose other than the MAI program. Documents possessed by Long prior to departing the United States for China bore such a "consortium restriction," which read, in pertinent part:

CONSORTIUM RESTRICTION

> The data contained herein shall not be disclosed outside the Government and shall not be duplicated, used or disclosed in whole or in part for any purpose other than the Metals Affordability Initiative (MAI) program(s). The Government shall have the right to duplicate and use the data generated from these programs to the extent set forth in the controlling Technology Investment Agreement . . . . Any Consortium Member rights to said data shall be as set forth in the MAI Collaboration Agreement dated 6/25/99, and subsequently amended from time to time and executed among the Consortium Members . . . .

The documents found in Long's luggage at Newark International Airport were reviewed by subject-matter specialists at Company B who confirmed that it provided the documents to Company A (where Long worked) as part of the consortium. Company B further confirmed that Long was never an employee of Company B. The documents contained warnings that they contained proprietary information, stating, for example:

> The information in this document is the property of [Company B] and may not be copied or communicated to a third party, or used for any purpose other than that for which it is supplied without the express written consent of [Company B].

The documents also contained warnings that they were subject to United States export controls, stating, for example:

> WARNING – This document contains technical data whose export is restricted by the Arms Export Control Act (Title 22, U.S.C. SEC 2751, et seq.) or the Export Administration Act of 1979, as amended, Title 50, U.S.C., App. 2401, et seq. Violations of these export laws are subject to severe criminal penalties.

According to Company B, one of the documents provided a detailed a roadmap as to how the consortium members intended to achieve their goal of lowering the costs of metals used, while maintaining technologically advanced components that would withstand extreme temperatures and high velocity.

The United States Air Force has further confirmed the highly sensitive, technologically advanced and valuable nature of the information, insofar as the documents set forth detailed equations that would provide direct insight on how to process titanium to achieve desired performance characteristics. The United States Air Force has also confirmed its belief that *certain* documents referenced herein would be subject to export controls. According to the Air Force, the combined package of documents also represents not only years of collaborative effort, but also touches upon significant prior development work, and is therefore preliminarily estimated to have a value approaching $50 million.

During an interview at Newark Liberty International Airport on November 5, 2014, Long told FBI agents that he had downloaded the materials from a publicly available website. Long admitted that he received legal training while he was employed at Company A regarding the handling of proprietary or export controlled materials. Long, however, claimed that he did not pay attention or fell asleep during such training. While Long admitted that he had previously heard the term "ITAR," he was not familiar with its meaning. As noted above, during the

interview, Long maintained that he had obtained the documents found in his possession via an open source search of Google or Google Scholar. Long was unsure what computer he may have used to access the materials, although he thought it may have been a Cornell University library computer to which he had access due to his girlfriend's status as a full-time graduate student. When given the opportunity by the interviewing agents to demonstrate where and how he had found the documents online, using an interviewing agent's internet capable device, Long was unable to do so.

As indicated in his motion for pre-trial release, on November 6, 2014, Long initiated contact with the FBI and provided them with a list of website links, claiming that he obtained the documents from those, or similar links. Long fails to mention in his motion that the documents referenced herein could not be located on the websites provided by Long, some of which were inactive. Moreover to date, Long nor his attorney have been able to show that any of the documents that Long possessed in his luggage are available on the internet.

When Long was arrested in Ithaca, NY on November 7, 2014, federal agents were able to review documents that included a letter dated October 29, 2014 from the Canadian Consulate in Hong Kong that was sent by email to Long in Ithaca, New York through an email associated with Long. The correspondence related to an application for permanent residence in Canada by *both* Yu Long and his girlfriend, which appears to have been initiated by them at the Canadian Consulate in Honk Kong/PRC. The letter requested a number of supporting documents from both Yu Long and his girlfriend to continue to process their application for permanent residence in Canada.

Finally, it is worth nothing that the forensic review to date has discovered over 70 unique files which appear to be export controlled pursuant to the International Traffic in Arms

Regulations. These documents were identified on digital devices which forensics place outside the U.S. in the summer of 2014. Specifically, an initial forensic examination of Long's laptop seized from Long subsequent to his arrest in Ithaca, New York, has determined that the laptop was used to log in to Long's Skype account while Long is known to have been travelling outside the U.S. The same logs demonstrate that Long's Skype account was accessed by Long's laptop from an IP address which is known to be geographically located in China. Link files (".lnk") found to be on Long's laptop indicate that the device was connected to an external hard drive matching the description of an external hard drive seized from Long at Newark Liberty International Airport on November 5th subsequent to the discovery of ITAR materials in Long's checked baggage (the device was an Apricorn Aegis Padlock USB external hard drive). At least nine of the previously identified ITAR files on the external hard drive were apparently accessed while LONG, the laptop, and the external hard drive are believed to have been in China. While the digital analysis is ongoing, there appears to be little doubt Long took the drive with him to China in the summer of 2014, at which time there was a substantial body of ITAR controlled materials present on the drive.

## II. LAW

Section 3142(e) of the Bail Reform Act of 1984 requires that a defendant shall be detained pending trial if it is determined, after a hearing, that "no condition or combination of conditions will reasonably assure the appearance of that defendant as required and the safety of any other person and the community . . . ."

In evaluating whether there are conditions of release which will ensure the appearance of Long and the safety of the community, the Court must consider:

(1) the nature and circumstances of the crime charged;
(2) the weight of the evidence against the defendant;

(3) the history and characteristics of the defendant, including family ties, employment, financial resources, community ties, drug or alcohol abuse history, past conduct; and

(4) the nature and seriousness of the danger to the community or to an individual that would be posed by release.

*See* 18 U.S.C. § 3142(g).

## III. DISCUSSION

As set forth herein, the government submits that based on the applicable law and evidence in this case, there are no conditions or combinations of conditions that will adequately ensure the safety of the community and deter flight or Long's appearance in Court. *See* 18 U.S.C. § 3142(g).

The circumstances of this crime portray an individual who obtained employment with a U.S. military defense contractor where he worked for almost 7 years and, in violation of the terms of his employment, stole highly sensitive military technology. Long stole not only proprietary material belonging to Company A but also was able to steal proprietary information belonging to Company B. Hundreds of pages of export controlled material has been found in Long's possession and it is clear that Long transported some of the material to China in the summer of 2014 and that he attempted to transport it again to China in November 2014. Many of the documents are proprietary, trade secret or export controlled documents.

In testimony before Congress dated May 13, 2014, Randall C. Coleman, Assistant Director of the Counterintelligence Division of the FBI testified:

> Our foreign adversaries and competitors are determined to acquire, steal, or transfer a broad range of trade secrets in which the United States maintains a definitive innovation advantage. This technological lead gives our nation a competitive advantage in today's globalized, knowledge-based economy. Protecting this competitive advantage is vital to our economic security and our national security.

> .Economic espionage and theft of trade secrets are increasingly linked to the insider threat and the growing threat of cyber-enabled trade secret theft. The employee who poses an insider threat may be stealing information for personal gain or may be serving as a spy to benefit another organization or country. Foreign competitors steal trade secrets by aggressively targeting and recruiting insiders; conducting economic intelligence through bribery, cyber intrusions, theft, and dumpster diving (in search of intellectual property or discarded prototypes); and establishing joint ventures with U.S. companies. Long gone are the days when a spy needed physical access to a document to steal it, copy it, or photograph it where modern technology now enables global access and transmission instantaneously.
>
> China often is cited as particularly active in the theft of trade secrets. According to a report submitted to Congress by the U.S.-China Economic and Security Review Commission in November 2012, China "depends on industrial espionage, forced technology transfers, and piracy and counterfeiting of foreign technology as part of a system of innovation mercantilism." By obtaining what it needs illegally, China avoids the expense and difficulty of basic research and unique product development, the report concluded. Created by Congress in 2000, the Commission's mandate is to monitor, investigate, and report to Congress on the national security implications of the bilateral trade and economic relationship between the United States and the People's Republic of China.

The nature and circumstances of the offense, along with the strength of the evidence and seriousness of the danger posed by a man who has acted on his stated desire to bring his expertise to a nation that has been identified as actively stealing trade secrets make clear that Long has every incentive to return to his native China where his knowledge and any information that he still may possess will be of benefit.

Long is also a significant flight risk. Long has no current employment or current residence in the United States. Moreover, the e-mails establish Long's intent to reside and work in China. Long's girlfriend is a native and citizen of China and has no permanent resident status in the United States. As noted above, Long has already brought one of their children back to China to reside with relatives and has made clear in his October 22, 2014 email that he and his family would all return to China in December 2014. Moreover, Long and his girlfriend had a recent and active application pending with Canadian authorities for immigration status in Canada.

In short, he has no interest, and has no reason, to remain in the US. Long's girlfriend also recently registered a company in China. It is inconceivable that Long's girlfriend could serve as a proper third party custodian. Significantly, Long was arrested at the airport on his way to China during which he was transporting an external hard drive containing export controlled material and three hard copy documents that were clearly labeled export controlled.

The crimes involved in this case carry very serious penalties. In addition, the Government is continuing its investigation. The strength of the evidence as outlined above, combined with the likelihood of a significant prison sentence, provide a powerful incentive for this defendant to renew his efforts to flee to his home country - China, a country from which he cannot be extradited. As this Court has already found in a similar case, -- it would be "irrational" for this defendant to remain in this county.

## IV. CONCLUSION

For the foregoing reasons, the defendant's motion for pre-trial release should be denied and Long should remain detained.

Respectfully submitted,

DEIRDRE M. DALY
UNITED STATES ATTORNEY

KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct24433
United States Attorney's Office
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000 / (203) 579-5575 (fax)
Krishna.Patel@usdoj.gov

/s/
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
Federal Bar No. ct19105
United States Attorney's Office
1000 Lafayette Boulevard, 10th Floor
Bridgeport, Connecticut 06604
(203) 696-3000 / (203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

**CERTIFICATION**

I hereby certify that on March 5, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

/s/
KRISHNA R. PATEL
ASSISTANT UNITED STATES ATTORNEY